Filed 5/27/15  P. v. Mendoza CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARK ANTHONY MENDOZA, SR.,<br><br>        Defendant and Appellant. | F067023<br><br>(Super. Ct. No. BF138387)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Mark Anthony Mendoza, Sr., a Varrio Bakers criminal street gang member, was convicted of the first-degree, special-circumstance murder of Roman Fernandez, a member of the rival Colonia Bakers gang.  He was also found guilty of several additional

charges.  Mendoza received a sentence that included a term of life without the possibility of parole.  He now contends:  (i) the trial court erred in failing to give, on its own motion, a jury instruction stating that the jury must decide whether two prosecution witnesses were accomplices and, if so, must view their testimony with caution and must not convict Mendoza solely on the basis of their uncorroborated testimony; (ii) the trial court erred when it refused to try gang enhancements separately in a bifurcated trial and failed to sever a charge of being an active participant in a gang; (iii) the trial court erred by failing to instruct the jury that the charge of being an active gang participant required proof that Mendoza acted, on some occasion, in concert with at least one other gang member, and in any event there was insufficient evidence to prove the gang participation charge because it was not shown that Mendoza acted in concert with another gang member; and (iv) there was insufficient evidence to prove the gang enhancements or the gang-murder special circumstance.

The People concede, and we agree, that there was insufficient evidence to prove that Mendoza acted in concert with another gang member.  Therefore, under *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*), Mendoza could not properly be convicted of being an active gang participant.  We also conclude that there was insufficient evidence to support the gang enhancements on the charges of being a felon in possession of a gun and ammunition.  The gun and ammunition in question were not shown to be connected with the murder and not otherwise shown to be possessed for the benefit of Mendoza's gang.  We reject the remainder of Mendoza's arguments.

The People assert, and Mendoza does not dispute, that the record reflects sentencing errors.  Specifically, the court made findings that supported a number of sentence enhancements based on prior offenses but failed to include those enhancements in the sentence it imposed.

We reverse the conviction on count 5 (being an active gang participant) and the gang enhancements on counts 3 and 4 (being a felon in possession of a firearm and

2.

ammunition).  We remand to allow the trial court to recalculate Mendoza's sentence in light of these reversals and to correct the sentencing errors.  We affirm the judgment in all other respects.

## FACTS AND PROCEDURAL HISTORY

At a Bakersfield bar called Stella's Sandtrap, sheriff's deputies and an ambulance arrived in response to a reported shooting around 1:50 a.m. on August 21, 2011.  They found Roman Fernandez lying in the parking lot with a gunshot wound to his chest, not breathing, and with no pulse.  Fernandez was taken to a hospital, where he was pronounced dead at 2:12 a.m.  An autopsy showed that he was killed by a single shot that entered the left side of his chest, exited near his right armpit, and damaged his heart, liver, diaphragm, and right lung.

The district attorney charged Mendoza with the crime.  The information alleged five counts:  (1) first-degree premeditated murder (Pen. Code, §§ 187, subd. (a), 189[1]); (2) discharging a firearm at a person from a motor vehicle (former § 12034, subd. (c)); (3) being a felon in possession of a firearm (on a separate occasion—Aug. 25, 2011, four days after the shooting) (former § 12021, subd. (a)(1)); (4) being a felon in possession of ammunition (also on Aug. 25, 2011) (former § 12316, subd. (b)(1)); and (5) actively participating in a criminal street gang (§ 186.22, subd. (a)).  In connection with count 1, the information alleged the special circumstances that the murder was committed by firing a gun from a motor vehicle (§ 190.2, subd. (a)(21)) and that it was committed by an active participant in a criminal street gang to further the gang's activities (§ 190.2, subd. (a)(22)).  In connection with counts 1 through 4, the information alleged, for sentence-enhancement purposes, that the offenses were committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)).  Also for sentence-enhancement purposes, the information alleged in connection with counts 1 and 2 that Mendoza personally fired a

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

gun, causing death (§ 12022.53, subd. (d)).  For count 1, the information alleged that Fernandez was killed by a gun fired from a motor vehicle (§ 12022.55).  Finally, in connection with all counts, the information alleged that Mendoza had previously been convicted of two robberies and one count of possessing a controlled substance for sale. For sentencing purposes, the robberies were alleged to be serious felonies (§ 667, subd. (a)), strikes under the Three Strikes Law (§§ 667, subds. (c)-(j), 1170.12), and offenses for which Mendoza had served a prison term after which he did not remain free of felony convictions for five years (§ 667.5, subd. (b)).  The possession-for-sale conviction was also alleged to be an offense for which Mendoza served a prison term after which he did not remain free of felony convictions for five years.  The section 12022.55 enhancement was later voluntarily dismissed by the prosecution, and count 1 was amended during trial to add an allegation that Mendoza personally used a firearm (§ 12022.5, subd. (a)).

At trial, two witnesses testified that they were in a pickup truck with Mendoza when Mendoza fired a gun through the window at Fernandez.  These witnesses were Gabriel Ramirez (we will refer to Gabriel and Sandra Ramirez by their first names to avoid confusion) and Mark Mendoza, Jr.  Mark Mendoza, Jr., is Mendoza's son.  (To avoid confusion, we will refer to him as Mark, Jr.)  Gabriel is a cousin of Mark, Jr.'s, girlfriend.  Gabriel testified that at closing time, at the end of a night of drinking at Stella's Sandtrap, he, Mark, Jr., and Mendoza got into a four-door truck.  Mendoza was in the right front seat, Gabriel was in the right rear seat, and Mark, Jr., was the driver. The truck began to back up, and a Hispanic man with tattoos on his face walked up to it on the passenger side.  When the man was within a few feet of the truck, Gabriel leaned back to go to sleep.  His window was open.  He heard a loud pop that made his ears ring. He saw a flash and heard the man outside the truck scream.  Then he saw a gun, held by Mendoza, pointing out the right front window.  A rag was covering Mendoza's hands. Mendoza brought his hands back inside and the truck sped away.  They drove to the

4.

home of Eva Soto, who at the time of trial was Mendoza's fiancée. (Gabriel thought it was Mendoza's house, but Soto testified that Mendoza was not living there.)

Mark, Jr., testified that he, his father, and Gabriel got into the truck to leave Stella's Sandtrap. Mark, Jr., who had had three or four beers, was driving. Mendoza was in the front passenger seat, and Gabriel was behind Mendoza in the right rear seat. As they got in, Mendoza said he wanted to fight Roman Fernandez because of an incident earlier in the evening (described in more detail below) between Gabriel and a woman who was part of a group that included Fernandez. Mark, Jr., pleaded with Mendoza to just come home. Mark, Jr., backed the truck out of its parking space and then stopped, because he thought Mendoza was about to get out and fight. Instead, Mark, Jr., heard a pop and saw a flash on his right, where Mendoza was sitting. Mark, Jr., did not see a gun, but he saw Mendoza drawing his hands, which were covered with a shirt, back into the truck through the window. Mark, Jr., was convinced Mendoza had shot someone, but he admitted he did not see it happening. Gabriel's window was closed. Mark, Jr., drove to Soto's house.

The jury was shown video footage taken by a surveillance camera aimed at the parking lot of Stella's Sandtrap. The video is dark, and the events in question take place a considerable distance from the camera, toward the back of the parking lot. A pickup truck can be seen backing out of a parking space and then stopping. The right rear door opens, someone gets in, and the door closes. Then another person walks up to the truck on the passenger side. Bystanders suddenly look or move toward the truck. The truck pulls away quickly and a person falls to the ground.

Several witnesses at trial described events that led up to the shooting. Rosemary Delarosa, who was Mark, Jr.'s, girlfriend, testified that she went to Stella's Sandtrap on the night of the shooting with Mark, Jr., Gabriel, and Sandra Ramirez. Gabriel and Sandra were siblings; they were also cousins of Delarosa. They arrived around 10:00 p.m. Mendoza and Soto joined them about 20 minutes later. Delarosa got drunk.

5.

Around midnight, a woman threw a pitcher of beer at the group. At the time, Delarosa did not know what prompted the woman to do this. At closing time, the six companions left the bar together. The men got in Delarosa's truck and the women in Soto's car. Mendoza told Delarosa to ride in Soto's car.

Gabriel, in his testimony, explained why the beer was thrown. While drunk, he tapped a woman on the rear end with his foot "to get her attention." She became angry and threw the beer. Delarosa and Sandra argued with the woman who threw the beer. Fifteen or 20 minutes later, Delarosa and Sandra persuaded Gabriel that he ought to leave. Mark, Jr., and Sandra drove him to Sandra's house. When they got there, however, Gabriel decided he was being wrongly punished when he had not done anything wrong; he insisted on going back. When he got back, a man approached him and asked in a "weird" way who he was. The man was Hispanic and had tattoos on his face.

Mark, Jr., testified that Mendoza told him Roman Fernandez had been talking with the woman who threw the beer. Mendoza told Mark, Jr., he wanted to fight Fernandez.

Eva Soto testified that the woman whom Gabriel tapped with his foot was with some men, one of whom had "Colonia" tattooed on his face. The Colonia Bakers are a criminal street gang in Bakersfield. Mendoza, Soto's boyfriend, had many tattoos on his body, including some saying "Varrio." The Varrio Bakers are another criminal street gang in Bakersfield. Soto had been with Mendoza for 18 years and had not seen any new tattoos on him during the last 10 years. Mendoza was diagnosed with leukemia in 2007 and was receiving chemotherapy.

At closing time, Soto left in her car with Delarosa and Sandra. She was drunk. They stopped at a supermarket to get more beer, then drove to Soto's house.

Sandra testified that she, too, was drunk at Stella's Sandtrap on the night of the shooting. She also described leaving the bar in Soto's car with Soto and Delarosa, buying beer, and proceeding to Soto's house.

Daniel Garduno, a customer at Stella's Sandtrap on the night of the shooting, testified about interactions he had with Mendoza there. Garduno said he was a former member of the Varrio Bakers and had agreed to testify in exchange for the dismissal of pending charges. He had the letters VB tattooed on his face and other gang tattoos elsewhere on his body. He also said he had terminal cancer of the spine and had been told shortly before the time of trial that he had six to eight months to live.

Garduno testified that, as he stood at the bar, played pool and danced, he was approached a number of times by a man who had a tattoo on his forehead labeling him a member of the rival Colonia Bakers gang. The man was called Negro and he asked Garduno if he knew where he was and whether he was comfortable. Stella's Sandtrap was in Colonia Bakers territory, according to Garduno. Garduno understood Negro to be expressing disrespect to him as a rival, but Garduno did not react, since he was no longer an active Varrio Bakers member. Garduno did tell Negro he was from the Varrio Bakers, however.

Mendoza also approached Garduno at Stella's Sandtrap and introduced himself as Huero from Varrio Bakers. They shook hands and Garduno felt comfortable knowing a Varrio Bakers member was present. Later, Mendoza approached again, upset, and told Garduno some men were "rubbing on his wife's friends." Mendoza pointed the men out to Garduno. They were Colonia Bakers members. Garduno told Mendoza not to worry. He said, "If they start tripping, I'm right here." "Tripping" meant acting out or behaving disrespectfully. As he was leaving for the night, Garduno saw Mendoza again. Mendoza asked Garduno if he was leaving. Garduno said yes. Mendoza said, "[W]ell, I got the fuska," which was a term for a gun. He showed the gun to Garduno. Garduno asked whether Mendoza had the gun because "[t]hese fools are still tripping." Mendoza said yes. Garduno said he would remain, but he did not. Garduno was concerned that someone might have told Mendoza that Garduno was a gang dropout and that Mendoza might use the gun on Garduno.

The jury was shown another surveillance video from the parking lot of Stella's Sandtrap. Garduno identified one man in the video as himself and another as Mendoza. Mendoza and Garduno face one another briefly and Mendoza quickly removes a hand from his pants pocket and puts it back in. Garduno testified that the video showed the moment when Mendoza revealed the gun. The gun is not visible in the video. Delarosa testified that she remembered seeing Mendoza speaking with a man who had a tattoo on his face.

Mendoza's five companions also testified about events following the shooting. Gabriel testified that he, Mendoza, and Mark, Jr., drove to Soto's house and that the three women arrived there also. Gabriel did not speak with any of them about the shooting. Mendoza "had told me to keep my mouth shut or he would peel my cap back, too," Gabriel testified. Gabriel took this to mean Mendoza would shoot him. Gabriel left the house and did not speak to Mendoza again. Three days later, someone in a car followed Gabriel and his daughter to church. Gabriel was afraid, so when he got inside, he asked the pastor for the phone number of a police officer who attended the church. From the officer, he learned that it was sheriff's deputies who had followed him. Gabriel decided to tell the story of the shooting to the deputies. At his own request, Gabriel was placed in the witness-protection program.

Mark, Jr., testified that after he heard the shot and began driving away, he asked his father what had happened. Mendoza told him just to keep driving. When they arrived at Soto's house, Mendoza went into the garage and came back out after about five minutes. Later, on the patio, Mark, Jr., heard Mendoza and Gabriel arguing about something Gabriel had said to Soto. Mendoza told Gabriel to be quiet. Mark, Jr., discussed the shooting with Mendoza, Delarosa, Gabriel, and Sandra.

Mark, Jr., was arrested as a suspect in the shooting. He was held for four days, during which he did not tell police what he had seen. A week after being released, he

8.

went to the police and told them his father shot Fernandez. He was not promised that he would not be charged.

Delarosa testified that as she, Soto, and Sandra were driving away from Stella's Sandtrap at closing time and heading for the supermarket to buy beer, she heard a pop like a firecracker. She could not tell where it came from. When they got to Soto's house, Mark, Jr., and Gabriel did not tell her anything about what happened. Mark, Jr., cried and said she did not need to know and it was none of her business. He did, however, tell her he heard a shot and his ear was ringing. Later, after being released from custody, Mark, Jr., finally told Delarosa that Mendoza shot someone.

Sandra testified that, after they all arrived at Soto's house after leaving Stella's Sandtrap, she heard Mendoza arguing with Gabriel. Mendoza "told my brother Gabriel I should split your wig like I did to the other fool." Mendoza also said "that when he shot the guy, he shot him from the side, that he barely missed him."

Eva Soto testified that when she and the others came to her house after leaving Stella's Sandtrap, there was an argument, but it had nothing to do with the shooting. She argued with Gabriel over Gabriel's "disrespectful," "obnoxious," and "out of control" drunken behavior. She did not hear Mendoza threatening anyone. Soto did not know about the shooting at all that night.

The prosecution presented evidence about the discovery of a gun and some ammunition in Soto's house. Detective James Newell testified that he searched Soto's garage and found a .380-caliber Bersa handgun among some clothes in a cardboard box. Seventeen bullets of a different caliber (.22) were found in the same place. Soto testified that the gun did not belong to her or her children, and she did not know to whom it belonged. Ramon Gallardo Garcia, a resident of Arvin, testified that the same gun was stolen from his home in June 2010. A criminalist testified that he tested swabs taken from the gun for DNA and compared the results with a sample of DNA taken from Mendoza. DNA from the trigger had at least two contributors. One contributor had a

9.

profile shared by Mendoza which matched the profile of one in 5.4 million Hispanic people.

The prosecution played for the jury a recording of a telephone conversation between Mendoza and Soto that took place while Mendoza was in jail. During this conversation, Soto said, "Well they, they found the other gun out in Arvin and they found bullets that [Audi] got from her dad's house. Remember those ones? Where were those at?" "They were right there," Mendoza replied, "[w]ith the gun." Audi is Soto's daughter. Soto testified that Audi's father (who is not Mendoza) gave Audi the bullets that were found in the garage. Soto also testified that she referred to Arvin when describing the gun the officers found because one of the officers had said something about Arvin at the time of the search.

Officer Shane Shaff of the Bakersfield Police Department testified as an expert on criminal street gangs. He opined that the Varrio Bakers are a criminal street gang engaged in a pattern of criminal gang activity, with primary activities of narcotics sales, shootings, stabbings, murder, and auto theft. He based this opinion on his numerous contacts with and arrests of gang members in Bakersfield, including Varrio Bakers members. He also relied on several specific convictions of predicate offenses committed by Varrio Bakers members. The primary rivals of the Varrio Bakers are the Colonia Bakers and the Okie Bakers.

Shaff also opined that Mendoza was an active participant in the Varrio Bakers at the time of the shooting. For this opinion, Shaff relied on several factors: Garduno had testified that he and Mendoza were both Varrio Bakers members. Mark, Jr., said Mendoza was a member. There were five offense reports in which Mendoza was described as participating in offenses Shaff considered to be characteristic gang activities or in which Mendoza claimed to be a Varrio Bakers member. Mendoza had several gang tattoos on his chest, stomach, hand and legs, including some that referred specifically to

the Varrio Bakers. Based on similar information, Shaff opined that Fernandez was a member of the Colonia Bakers at the time of the shooting.

The prosecutor asked Shaff the following question:

"An active participant of the Varrio Bakers arrives at a bar that is within the Colonia Baker territory. While in that bar he leaves the bar and goes and locates a firearm, comes back and shows that firearm to another person he believes to be part of his same gang, the Varrio Bakers, 20 minutes prior to the shooting. The known active participant of the Varrio Bakers exits the bar with some family members, enters a vehicle, and upon a Colonia Baker coming alongside that vehicle shoots that Colonia Baker criminal street gang member.

"Do you have an opinion as to whether or not that incident is for the benefit of the Varrio Bakers criminal street gang?"

Shaff's opinion was that it was. He said the shooting would benefit the gang by boosting the reputation of the gang and the member and instill fear in rival gangs and the public.

Mendoza testified in his own defense. In his telling, the story of his night at Stella's Sandtrap was as follows: When he and Soto arrived, they sat down and the man he later learned was Roman Fernandez was sitting next to them. Fernandez had "Colonia" tattooed on his forehead. Later, near the pool tables, Soto saw a friend of hers who was with Garduno. They spoke to the friend, who introduced Garduno as Kiki. Garduno asked Mendoza if he was "from the Varrio." Mendoza said he "used to be."

At one point, Mendoza and Soto left the bar, drove to an ATM, and returned. In the parking lot, Mendoza saw and spoke with Garduno. Mendoza had some marijuana in his pocket. He showed it to Garduno and asked if Garduno wanted to smoke. Garduno said no. Mendoza did not have a gun and was not familiar with the term "fuska."

Back inside the bar, Gabriel, whom Mendoza did not know well, was talking with some women who were standing near Fernandez. Mendoza had to ask Mark, Jr., who Gabriel was, as he had met him only one time before and had forgotten him. Gabriel

11.

kicked one of the women in her rear end and the woman threw beer. Then the woman talked with Fernandez, who looked over at Gabriel and Mendoza. Mendoza went and spoke to Garduno. Mendoza said, "[H]ey, these guys over here are tripping about this guy over here. And, you know, that was it. I said if something cracks off, you know, would he fight."

At closing time, Mendoza and Mark, Jr., went out to the parking lot and got in the truck. Mark, Jr., was driving and Mendoza was in the front passenger seat. Mark, Jr., backed out of the parking space and then Gabriel walked up and Mark, Jr., stopped to let him get in the back seat. Mendoza took off his hat and shirt. He was sitting in his undershirt and preparing to fasten his seatbelt when he heard a gunshot from behind. He did not see what happened. He did not know if they were being shot at. He told Mark, Jr., to drive away.

At Soto's house, Mendoza inspected the truck for bullet holes. Gabriel called someone on his phone.

Mendoza denied that he ever said he would peel anyone's cap back or split anyone's wig. When he and Soto referred to a gun during the recorded telephone call, they were talking about a BB gun that belonged to Soto's son. Mendoza admitted on cross-examination that he left some bullets in Soto's house. He said he put them with the BB gun.

Mendoza testified that, in the summer of 2011 before the shooting, he did laundry in Soto's garage and helped clean the garage. He authenticated a picture of himself holding a child in a blue shirt and said this was the same shirt that the gun was found with in the box in the garage. He had never seen the gun before.

Mendoza admitted that he had once been a Varrio Bakers gang member, but claimed he was one no longer. He said he dropped out in 1991.

Mendoza testified that when Mark, Jr., was a teenager, Mark, Jr., was part of a "tagging crew" that was originally affiliated with the Varrio Bakers. Later the crew had a falling out with the Varrio Bakers and became affiliated with the Colonia Bakers.

In closing arguments, the prosecution's theory was that Mendoza murdered Fernandez because Fernandez was a member of a rival gang. The defense theory was that Gabriel killed Fernandez over the conflict arising from Gabriel's mistreatment of one of the women who were with Fernandez.

The jury found Mendoza guilty of all charges and found the murder to be in the first degree. It found true the special circumstances and the enhancement allegations. The court subsequently found the prior conviction allegations true.

The court sentenced Mendoza as follows: On count 1, life without the possibility of parole, plus 25 years to life for personally discharging a firearm causing death, plus one year for each of the three prior prison terms; on count 2, seven years, plus five years for the gang allegation; on count 3, three years, plus four years for the gang allegation; on count 4, three years, plus four years for the gang allegation; and on count 5, three years. The sentences on counts 2, 3, and 5 were stayed pursuant to section 654. The total sentence was life without the possibility of parole, plus 25 years to life, plus 10 years.

## *DISCUSSION*

### I.    *Accomplice testimony instructions*

Mendoza argues that the court erred when it failed to give, on its on motion, an instruction directing the jury to view the testimony of Gabriel and Mark, Jr., with caution, and not to convict Mendoza based on their testimony without corroboration, if they were accomplices in the killing of Fernandez. Mendoza does not claim he requested such an instruction.

Section 1111 provides:

"A conviction [cannot] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the

defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The substance of section 1111 has long been the law because of the dangers generally associated with accomplice testimony. "[I]t was, of course, recognized that evidence of an accomplice, coming from a tainted source, the witness being … a man usually testifying in the hope of favor or the expectation of immunity, was not entitled to the same consideration as the evidence of a clean man, free from infamy." (*People v. Coffey* (1911) 161 Cal. 433, 438.)

To comply with section 1111, a trial court must, on its own motion, give the jury an appropriate instruction in any case in which there is sufficient evidence at trial that a witness is an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) CALCRIM No. 334 is appropriate when it is a question of fact for the jury whether the witness is an accomplice, while CALCRIM No. 335 is appropriate if the court concludes as a matter of law, or the parties stipulate, that the witness is an accomplice. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1270-1271.)

In this case, there was no basis for the court to determine as a matter of law, and the parties did not stipulate, that Gabriel or Mark, Jr., were accomplices. We will assume for the sake of argument, however, that there was substantial evidence that would have supported a finding that Gabriel, at least, was an accomplice. It was open to the jury to believe Mendoza's testimony and conclude that Gabriel was the shooter.

The People argue that section 1111 does not apply if the evidence supports the view that the witness was a direct perpetrator rather than one who assists in the crime, but this is incorrect. (*People v. Fauber* (1992) 2 Cal.4th 792, 833-834 [accomplices for purposes of § 1111 are all those defined as principals by § 31, i.e., all direct perpetrators

and all aiders and abettors].) The People also argue that the instruction was unnecessary because Mendoza's "theory" was that Gabriel was the *sole* perpetrator, not Mendoza's accomplice. The question, however, is not what Mendoza wanted the jury to find, but what the jury could reasonably find. We assume the jury could have accepted the proposition that Gabriel was the shooter but still rejected Mendoza's claim that he never had the gun and was uninvolved. Accordingly, we assume it was error not to instruct the jury with CALCRIM No. 334 or its equivalent.

It has been held that an erroneous failure to instruct on accomplice testimony in accordance with section 1111 is harmless if "there is sufficient corroborating evidence in the record." (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) This corroborating evidence "may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes, supra,* 21 Cal.4th at p. 1271.) The corroborating evidence is sufficient to show harmlessness if "it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*People v. Fauber, supra*, 2 Cal.4th at p. 834; see also *People v. Gonzales* (2011) 52 Cal.4th 254, 303 [relying on foregoing authorities].)

Sufficient corroborating evidence was presented at trial in this case. Sandra testified that she heard Mendoza admitting he fired a shot at Fernandez and threatening to do the same to Gabriel. Garduno testified that Mendoza solicited his assistance in an expected conflict with a group of Colonia Bakers and, in connection with this request, showed him a gun. Under the standard just described, no more than this was required. If the jury believed Sandra and Garduno, it could reasonably conclude that Gabriel and Mark, Jr., were telling the truth and Mendoza was the shooter.

Mendoza argues that federal constitutional principles are at stake and therefore we should apply the harmless-error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, 36; i.e., we should ask whether the error was harmless beyond a reasonable doubt. There is no authority for the proposition that federal constitutional principles are at stake

15.

when a court fails to instruct on accomplice testimony under section 1111. In fact, as Mendoza acknowledges, in *People v. Frye* (1998) 18 Cal.4th 894, 968-969, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22, our Supreme Court held that the federal Constitution is not involved in the question of whether it is proper to allocate to the defendant the burden of showing that a witness is an accomplice under section 1111. This is because the accomplice-testimony issue is unrelated to the prosecution's burden of proving the elements of the offense. Mendoza says *Frye* did not deal with a failure to give any instructions on the accomplice-testimony issue, and the federal Constitution was violated here because the "accomplice status of a prosecution witness is intertwined with proof of the defendant's guilt .…" There is, however, no authority for the view that the federal Constitution is violated whenever a trial court's instructional error merely has *something* to do with proving guilt. A failure to give a section 1111 instruction is a state law error, and the *Chapman* standard does not apply.

## II.    *Bifurcation and severance*

### A.    *Bifurcation*

Mendoza made a motion to bifurcate the trial so that the evidence supporting the gang special circumstance and the enhancements on counts 1 through 4 could be presented separately and not bias the jury on the question of guilt. The court denied the motion, stating that the gang evidence was admissible on the issue of guilt because the jury could find that Mendoza's gang membership was the motive for the killing and helped to show his intent. Mendoza now argues that the denial of the motion was incorrect. We review the ruling for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).)

Under section 1044, which vests discretion in the trial court to control the conduct of a criminal trial, a trial court is authorized to bifurcate a trial so that prior convictions or gang enhancements are not presented to the jury until after the jury has made a determination of guilt. (*Hernandez, supra*, 33 Cal.4th at pp. 1048-1049.) In the case of

16.

gang enhancement, bifurcation may be necessary because some of the evidence relevant to a gang-enhancement allegation, such as predicate prior offenses committed by the defendant, may be unduly prejudicial. (*Id*. at p. 1049.) At the same time, however, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*) Under such circumstances, denial of bifurcation would be appropriate. (*Id.* at pp. 1049-1050.) Further, in a gang-enhancement case, bifurcation can properly be denied even when gang-related evidence is presented that, absent a gang enhancement, would have been found substantially more prejudicial than probative and thus inadmissible under Evidence Code section 352. Countervailing considerations, such as conservation of funds and judicial resources, can prevail over a defendant's showing of potential prejudice under these circumstances. (*Hernandez, supra*, at p. 1050.) For this reason, "the trial court's discretion to deny bifurcation of a charged gang enhancement is … broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid*.)

We agree with the People's view that this is a case in which denial of a bifurcation request was appropriate because the gang evidence was sufficiently probative of guilt, since it demonstrated Mendoza's motive and intent. The evidence indicated that, after his friends had a conflict with someone associated with a gang rival, Mendoza formed a plan to take revenge on that rival and retrieved a gun to carry it out. Mendoza made his intentions known to a fellow Varrio Baker who happened to be present, showing the fellow member his gun and explaining why he had it. Officer Shaff's testimony helped the jury understand the significance of a Varrio Baker's act of retaliatory violence against

17.

a Colonia Baker in Colonia Baker territory.  This act would reinforce the reputation of the gang and member as a menace to rivals.

Even if some of the gang evidence would have been inadmissible had gang enhancements not been charged, "the countervailing considerations that apply when the enhancement is charged permitted a unitary trial." (*Hernandez, supra*, 33 Cal.4th at p. 1051.)  Given the relevance of Mendoza's gang membership to the question of guilt, we see nothing in the record that was so unduly prejudicial that the expense and delay of a bifurcated trial for the gang allegations were still necessary.  There was no abuse of discretion.

Mendoza also contends that the refusal to bifurcate violated federal due-process principles because the gang evidence was highly inflammatory and grossly unfair.  (See, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 127 [due process denied if joinder of counts results in gross unfairness].)  We disagree.  The gang evidence undoubtedly was damaging to Mendoza, but because it was closely intertwined with the proof of his guilt, the presentation of it to a jury determining his guilt was not unfair.

### B.      Severance

Mendoza did not ask the trial court to sever count 5, the gang-participation offense, for a separate trial.  He now contends we should interpret his bifurcation request as impliedly including a severance request, which the court erroneously denied when it denied the bifurcation motion, or else hold that trial counsel was constitutionally ineffective when he did not make a request for severance.  We will assume for the sake of argument that the bifurcation request was sufficient to preserve the issue for appeal and thus will analyze the issue directly, rather than applying an ineffective-assistance analysis.  We review a ruling on a motion for severance for abuse of discretion.  (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28.)  Cross-admissibility of the evidence from one trial in the other trial ordinarily renders severance unnecessary.  (*Ibid.*)

Failing to sever count 5 was not an abuse of discretion because, as discussed above, it was proper not to bifurcate the gang enhancements for counts 1 through 4, and essentially the same evidence was relevant to count 5 as was relevant to the enhancements. The gang-enhancement statute (§ 186.22, subd. (b)) and the gang-participation-offense statute (§ 186.22, subd. (a)) have somewhat different elements, but we see little or nothing in the record in this case that was admissible to prove the offense that was not also admissible to prove the enhancements. In other words, essentially all the gang evidence was cross-admissible. Because the jury properly would have heard the evidence relevant to count 5 in a trial limited to counts 1 through 4, severance of count 5 would not have protected any interest of Mendoza's, and the court consequently had discretion to deny severance.

### III. *Instructions and sufficiency of evidence for gang-participation charge*

Mendoza asserts that the evidence was insufficient and the jury instructions were incorrect for count 5, the gang-participation offense. The People concede the evidence was insufficient under *Rodriguez, supra,* 55 Cal.4th 1125. We agree.

*Rodriguez* deals with the meaning of the requirement that, to be a gang member under section 186.22, subdivision (a), a person must promote, further, or assist in criminal conduct "by members of that gang." Specifically, the case answers the question whether this language means the prosecution must prove the defendant committed a predicate offense, either as a principal or an aider and abettor, in concert with another person who was a gang member. (*Rodriguez, supra,* 55 Cal.4th at pp. 1128, 1131.) Some courts, including this one, had held that this was not required, and that a person could be proved to be a gang member based on a predicate offense in which he or she acted alone. (See *People v. Salcido* (2007) 149 Cal.App.4th 356, 368, overruled by *Rodriguez, supra*, at p. 1137, fn. 8.) Concluding that the predicate offense must be committed in concert with another, the Supreme Court explained its reasoning as follows:

19.

"Section 186.22(a) speaks of 'criminal conduct by *members* of that gang.' (Italics added.) '[M]embers' is a plural noun. The words 'promotes, furthers, or assists' are the verbs describing the defendant's acts, which must be performed willfully. The phrase 'any felonious criminal conduct' is the direct object of these verbs. The prepositional phrase 'by members of that gang' indicates who performs the felonious criminal conduct. Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez, supra*, 55 Cal 4th at p. 1132.)

This holding applies here. The People did not attempt to prove that Mendoza committed any predicate offense in concert with anyone. It follows that he was not proven guilty of violating section 186.22, subdivision (a), and his conviction on count 5 must be reversed. In light of this conclusion, it is unnecessary to discuss the claim that the jury was incorrectly instructed on count 5.

## IV.     *Sufficiency of evidence for gang enhancements and gang special circumstance*

Mendoza contends that the evidence was insufficient to support the true findings on the gang enhancements imposed on counts 1 through 4 under section 186.22, subdivision (b). Section 186.22, subdivision (b), provides a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members …."[2] Mendoza also claims the evidence was insufficient to support the true finding on the gang special circumstance

---

[2]The language "promote … any criminal conduct by gang members" is similar to language in section 186.22, subdivision (a), the gang-participation offense statute. In *Rodriguez,* as indicated above, our Supreme Court held that the reference to "members" in section 186.22, subdivision (a), means the defendant must have acted in concert with another gang member. The *Rodriguez* court also specifically stated, however, that there is no such requirement for a true finding under section 186.22, subdivision (b), despite the similarity of the language. (*Rodriguez, supra*, 55 Cal.4th at pp. 1138-1139.)

20.

alleged under section 190.2, subdivision (a)(22), in connection with count 1. Section 190.2, subdivision (a)(22), requires a finding that the defendant killed the victim intentionally while the defendant was an active participant in a criminal street gang and that the murder was committed to further the activities of the gang.

When considering a challenge to the sufficiency of the evidence to support a judgment, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which the finder of fact could make the necessary finding beyond a reasonable doubt. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding.[3] (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

The evidence was sufficient to support the gang enhancements on counts 1 (murder) and 2 (discharging a firearm at a person from a motor vehicle) and the gang special circumstance for count 1. The evidence indicated that Mendoza was a Varrio Bakers member and Fernandez was a Colonia Bakers member. After a conflict between members of the groups with whom Mendoza and Fernandez came to the bar, Mendoza retrieved a gun and sought the support of another Varrio member for an expected conflict. Officer Shaff opined that the shooting of a gang member by a rival gang member under circumstances like these would be for the benefit of a gang. Having heard that gangs seek to fortify their reputations by resolving conflicts with rivals by force, the

---

[3]Mendoza frames his argument in terms of federal due process but acknowledges that the standard for sufficient evidence under the federal Constitution is identical to the standard under California law. (See *People v. Johnson* (1980) 26 Cal.3d 557, 576 [California standard same as federal Constitutional standard stated in *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319].)

21.

jury could reasonably conclude that the requirements of section 186.22, subdivision (b), and section 190.2, subdivision (a)(22), were satisfied.

Mendoza proposes an alternative, non-gang-related explanation for his behavior, which he says defeats both the section 186.22, subdivision (b), finding and the section 190.2, subdivision (a)(22), finding: After the conflict between Gabriel and the woman who threw the beer, Mendoza wanted "to protect the people he was with, none of whom were gang members." The basic facts of the case do not support the view that Mendoza acted to protect anyone when he shot Fernandez. Mendoza shot Fernandez hours after the conflict between Gabriel and the woman was over and as Mendoza and his group were leaving. Delarosa, Soto, and Sandra had already driven away in another car. There was no evidence that Fernandez did anything threatening as he approached the pickup truck.

In any event, the existence of a possible alternative to the conclusions accepted by the jury is not a reason to find the evidence insufficient. As we have said, we do not reverse a judgment just because the evidence could be reconciled with a different outcome.

Mendoza also maintains that the evidence was insufficient because Officer Shaff's opinion "was not coupled with other evidence that [Mendoza] fired the shot with the specific intent to benefit the Varrio Baker gang." We disagree. Shaff's opinion was supported by other evidence. The testimony of several witnesses showed that there was a conflict between the people accompanying Mendoza and the people accompanying Fernandez. Garduno's testimony supported the conclusion that Mendoza felt this situation merited a response by him as a gang member confronting a rival gang member. Mendoza sought out assistance and support for this confrontation from a fellow Varrio Bakers member, a man who was otherwise unknown to Mendoza and whom he had no non-gang reason to approach.

22.

This case is thus unlike *People v. Albarran* (2007) 149 Cal.App.4th 214, 227, on which Mendoza relies, in which it was held that a gang motive was not shown because "the only evidence" supporting the view that the defendant acted to gain respect for his gang was "the fact of [the defendant's] gang affiliation." Here there was more. This case also is unlike *People v. Ramon* (2009) 175 Cal.App.4th 843, 851, on which Mendoza also relies, in which it was held that there were no facts to support a gang expert's opinion that the defendants acted to benefit a gang. There, the only facts were that the defendants were gang members and were stopped by police in their gang's territory. (*Id.* at p. 850.) Here, again, we have described circumstances supporting the enhancement that went beyond Mendoza's gang membership and the occurrence of the crime in rival gang territory.

We agree with Mendoza, however, that there was insufficient evidence to support the enhancement findings on counts 3 and 4, possession by a felon of a gun and ammunition. The prosecution's evidence tied Mendoza to the stolen gun and the bullets found in Soto's garage; it also tied Mendoza and his gang to the shooting. It did not, however, tie the gun or the bullets to the shooting or Mendoza's gang membership to his possession of the gun or bullets. In effect, the People asked the jury to infer that if a gang member is found to have committed a gang-related offense with a gun, then any gun or ammunition subsequently found in the member's possession must have been possessed by him for a gang-related purpose. Without more, this inference cannot properly be made because nothing prevents a gang member from possessing a gun or ammunition for purposes independent of his gang status.

The People's very brief argument on this point relies on the following evidence: Garduno's testimony that Mendoza showed him a gun; the evidence that Mendoza used a gun to kill Fernandez for a gang purpose; and Shaff's testimony that shootings are a primary gang activity. For the reasons just stated, this evidence was insufficient to show that Mendoza possessed the gun and bullets found in Soto's garage to benefit his gang.

23.

Perhaps the People could have proved that Mendoza possessed a gun and ammunition for a gang purpose on the date of the shooting, since he actually used a gun to commit a gang murder on that date. The People did not attempt to prove this, however. The information specifically charged Mendoza with gun possession on August 25, 2011—the date the gun was found in Soto's garage—not August 21, 2011, the date of the shooting.

The gang enhancements on counts 3 and 4 will be reversed.

## V.   *Sentencing errors*

The People have identified two sentencing errors, a clerical error in the court's minute order from the sentencing hearing, and a clerical error in the abstract of judgment. Mendoza does not dispute the existence of these errors.

The first sentencing error involves application of the Three Strikes Law. Each count of the information alleged that Mendoza was convicted of first-degree robbery (§ 212.5) in 1992 and again in 1994. The information further alleged that these offenses were strikes under the Three Strikes Law (§§ 667, subds. (b)-(i), 1170.12). The court found the allegations true. The sentence recommendation in the probation report, however, did not include enhancements for the strikes. At the sentencing hearing, the probation officer told the court that the Criminal Justice Information System did not show the strike priors. The prosecutor objected and pointed out that, under the Three Strikes Law, the sentences for each count should have included terms of 25 years to life. The court proceeded to sentence Mendoza without applying the Three Strikes Law.

The trial court was required either to impose or to strike the Three Strikes Law enhancements, and its failure to do either resulted in an unauthorized sentence. (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391.) We will direct the court to correct the error on remand.

The second sentencing error is similar to the first. The information alleged that the robberies from 1992 and 1994 were serious felonies under section 667,

24.

subdivision (a), and the court found the allegations true. Under section 667, subdivision (a)(1), five-year enhancements on each count were mandatory. (*People v. Purata* (1996) 42 Cal.App.4th 489, 498.) The court did not impose these enhancements. Again, we will direct the court to correct the error on remand.

The error in the court's minute order is the statement that the total sentence is life without the possibility of parole plus "the total fixed term of 35" years. The total sentence the court stated orally was life without the possibility of parole, plus 25 years to life, plus 10 years. The error in the abstract of judgment is that it indicates a determinate term of 25 years for the section 12022.53, subdivision (d), enhancement (personally firing a gun, causing death) on count 1. The correct term for that enhancement is 25 years to life. Since the court will be generating a new minute order and abstract on remand, we presume these errors will be corrected.

## VI.     *Cumulative error*

Mendoza argues that if we find multiple errors to be harmless separately, we should find them to be prejudicial cumulatively. We have identified only one harmless error—the failure to instruct on accomplice testimony—so there are not multiple harmless errors of which we could evaluate the cumulative effects.

### DISPOSITION

The conviction on count 5 and the true findings on the gang enhancements on counts 3 and 4 are reversed. The matter is remanded to the trial court for resentencing and correction of the sentencing errors identified in this opinion.

_____

Smith, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Franson, J.

25.